UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CHARLES PARKS, *next friend of* LAUREL S. PARKS, *deceased*, <br><br> Plaintiff, <br><br> v. <br><br> DAILY EXPRESS, INC. and DENNIS R. THOMPSON, <br><br> Defendants. | ) ) ) ) ) ) ) No.: 3:08-CV-519 ) (VARLAN/GUYTON) ) ) ) ) ) |

## **MEMORANDUM OPINION**

This civil action is before the Court on defendants' Motion for Summary Judgment [Doc. 20] and plaintiff's Motion to Amend Complaint [Doc. 28]. The series of filings made subsequent to, and in connection with, these two motions is complex, and is explained in greater detail below. The motion for summary judgment and the motion to amend are now ripe for this Court's consideration.

### I. Background

Plaintiff Charles Parks, next friend of Laurel S. Parks, deceased, filed the original complaint in this case in the Circuit Court for Roane County, Tennessee on November 25, 2008 [Doc. 1-1]. The case was removed to this Court on December 31, 2008 [Doc. 1]. Defendants Daily Express, Inc. ("Daily Express") and Dennis R. Thompson filed an answer to this complaint on January 6, 2009 [Doc. 3]. On April 9, 2010, plaintiff filed a motion to

amend his original complaint.[1] For the reasons set forth *infra* Part I, the Court will grant the motion to amend.

Based upon the averments in the amended complaint and on plaintiff's response to defendants' statement of material facts, the facts of this case are as follows: In November of 2007, Mr. Thompson was employed as a tractor-trailer driver for Daily Express [Doc. 28-1, ¶ 7]. Shortly after 7:30 a.m. on November 27, 2007, Mr. Thompson was hauling a wide load on a tractor-trailer owned by Daily Express, and was traveling westbound on Interstate 40 toward a construction zone [*Id.*, ¶ 5]. At the same time, Ms. Parks was driving a 2002 Nissan Sentra westbound on Interstate 40 toward the same construction zone [*Id.*]. The construction zone had two narrow lanes, and was bordered on the right-hand side of the road by a concrete wall [Doc. 25, ¶ 12].

As Mr. Thompson approached the construction zone, he checked his rearview mirror to make sure that the left-hand lane was clear of traffic [*Id.*, ¶ 21]. Due to the presence of the concrete wall on the right-hand side of the road, Mr. Thompson shifted his tractor-trailer to the left, such that it was approximately two (2) feet over the center line dividing the two westbound lanes [*Id.*, ¶ 20].

At this time, Ms. Parks was driving in the left-hand lane of the interstate behind Mr. Thompson [*Id.*, ¶ 22]. Ms. Parks went "back and forth several times" before attempting to pass Mr. Thompson's tractor-trailer on her right [*Id.*, ¶ 23]. When Ms. Parks eventually

---

[1] The Court generally refers to plaintiff in this case as "he" or "him," but recognizes that the decedent in the case is female.

passed the tractor-trailer, the tires on the driver's side of her vehicle were in the grass median on the left-hand side of the road [*Id.*, ¶ 25]. The right tires of Ms. Parks's vehicle were "just barely" on the pavement [*Id.*]. Ms. Parks's vehicle reentered traffic in front of the tractor-trailer [*Id.*, ¶ 28]. Ms. Parks's vehicle hit the concrete barrier, and flipped at least twice before coming to rest right-side-up in the grass median on the left-hand side of the road [*Id.*, ¶ 30].

Ms. Parks's vehicle never made contact with any portion of the tractor-trailer operated by Mr. Thompson [*Id.*, ¶ 31]. After the accident occurred, Mr. Thompson moved his vehicle to the left and continued in a straight path through the remainder of the construction zone [*Id.*, ¶ 35]. Ms. Parks was killed in this accident [Doc. 28-1, ¶ 5].

Defendants filed a motion for summary judgment on February 26, 2010 [Doc. 20]. Shortly before the response to the motion for summary judgment was due, counsel for the plaintiff filed a motion for an additional thirty days within which to respond to the motion for summary judgment [Doc. 23]. Counsel based his request for an extension on the failure of the expert he had retained to consider in a timely manner whether Mr. Thompson abided by the standard of care applicable to tractor-trailer drivers under the circumstances of the motor vehicle accident in question [*Id.*]. Counsel also filed a limited response to the motion for summary judgment at that time, in which he stated that "he anticipate[d] expert opinion addressing many of the alleged material facts set forth by defendants that may create an issue for trial by jury" [*see* Doc. 24].

The Court denied plaintiff's request for an extension on April 12, 2010 [Doc. 29]. The Court explained in its denial that counsel for plaintiff "waited more than three months after the deposition of Mr. Thompson to make the determination that arguments related to the proposed expert opinion on the potential standard of care issue in this case needed to be raised on summary judgment" [*Id.*]. It explained further that "plaintiff's request for an extension came only one day before the dispositive motion deadline" [*Id.*]. And it explained lastly that "permitting further discovery to support additional arguments that would be included in the response to the motion for summary judgment at this stage of the litigation would prejudice defendants," for a variety of reasons defendants set forth in their response in opposition to the motion for extension [*Id.*].[2]

Plaintiff filed a motion for reconsideration of this denial on April 15, 2010 [Doc. 30]. In its memorandum filed in support of the motion for reconsideration, counsel for plaintiff stated that, contrary to the Court's finding, the "determination of the need for an expert after a discovery deposition" of Mr. Thompson "was made fairly quickly after evaluating the actual testimony of" Mr. Thompson, whose deposition was taken on December 11, 2009 [Doc. 31]. Counsel for plaintiff averred that he retained the expert in the case in early

---

[2] Defendants argued in their response in opposition that the deposition of Mr. Thompson and of the two eyewitnesses to the accident were "not conducted with an eye toward plaintiff retaining an expert on the standard of care to be utilized by drivers when driving tractor-trailers through a construction zone"; that "if plaintiff intends to change [his] theory at this late stage, an amended complaint would need to be filed"; and that "it would be prejudicial at this late stage for defendants to be forced to defend a standard of care argument when, to date, the sole theory for plaintiff's complaint has been that . . . Mr. Thompson veered into plaintiff's lane of travel forcing her off the roadway" [Doc. 26].

4

February 2010 [*Id.*]. Counsel for plaintiff further averred that he was willing to "work with defense counsel to schedule any discovery necessary," including of plaintiff's expert witness, to accommodate any deadlines which would be affected [*Id.*].

The Court referred plaintiff's motion for reconsideration to magistrate judge Bruce Guyton on April 16, 2010 [*see* Doc. 32]. In ruling upon the motion, the magistrate judge found, "under all of the circumstances now present in the case"–but without further elaboration–that plaintiff's motion on reconsideration was "well-taken," and granted the motion for reconsideration [Doc. 33].[3] The magistrate judge further directed plaintiff to file a response to the pending motion for summary judgment on or before May 14, 2010 [*Id.*]. In compliance with this order, plaintiff filed a supplemental response to the motion for summary judgment on May 14, 2010 [Doc. 39]. Defendants filed a reply to that response on May 21, 2010 [Doc. 40].

In light of the magistrate judge's ruling, the Court will grant plaintiff's motion to amend his complaint, and will consider the parties' summary judgment arguments in light of the allegations in the amended complaint. For the reasons that follow, defendants' motion for summary judgment will be granted. This case will be dismissed.

---

[3] The magistrate judge filed the order granting the motion for reconsideration before the expiration of the period within which defendants were permitted to file a response to the motion for reconsideration, although the magistrate judge noted in his order that "defendants advised the Court that they would file a response to the said motion on or before April 21, 2010, but no response has been filed" [Doc. 33]. Defendants filed a response to the motion one day after the order was entered granting it [*see* Doc. 34]. The magistrate judge later "reviewed the defendants' response and memorandum" and "considered the arguments presented therein," but found "that the circumstances of th[e] case remain unchanged" [Doc. 37]. The Court thus reaffirmed its previous order granting the motion for reconsideration [*Id.*].

5

## II. Standard of Review

Summary judgment is proper only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The Court views the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The judge does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## III. Analysis

In plaintiff's original complaint, she alleged that Mr. Thompson, "suddenly and without warning . . . veered into the plaintiff's lane of travel, requiring the plaintiff to take immediate evasive action, causing her to lose control and leave the roadway and strike a concrete construction wall" [Doc. 1-1, ¶ 5]. Plaintiff alleged, in other words, that Mr. Thompson was negligent in encroaching into her lane of travel, and that this encroachment was the actual and proximate cause of her injury. Mr. Thompson does not dispute that his tractor-trailer encroached approximately two feet into plaintiff's lane of travel [*see* Doc. 20-1, pp. 7-8].

In plaintiff's amended complaint, she offers a new theory of recovery that is the inverse of her original theory of recovery. In the amended complaint, she contends that Mr. Thompson "failed to position his truck sufficiently in the narrowed roadway of the construction zone such that [plaintiff] would have been unable to pass on the left" [Doc. 28-1, ¶ 5]. Plaintiff alleges under this theory, in other words, that Mr. Thompson was negligent in not encroaching enough into her lane of travel to prevent plaintiff from passing Mr. Thompson on the left, and that this failure to encroach sufficiently into her lane was the actual and proximate cause of her injury.

Given that the parties largely agree on the relevant facts in this case,[4] the two questions left for the Court to answer are what the appropriate standard of care is for a driver

---

[4] The Court considers the available evidence in this case in more detail *infra* Part III.C.

in Mr. Thompson's position, and whether Mr. Thompson violated that standard of care. The Court considers these two questions below.

### A.     Applicable Standard of Care

Plaintiff enlisted the services of Mr. Michael K. Napier, Sr. to identify the appropriate standard of care for tractor-trailer drivers in construction zones [*see* Doc. 39-1]. Apart from the documents and depositions related to the accident at issue in this case, Mr. Napier reviewed the following sources in preparing his expert report:

(1) Selected federal motor carrier safety regulations;

(2) A manual published by the North American Transportation Management Institute entitled *Motor Fleet Safety Supervision, Principles & Practices*;

(3) A manual sponsored by the FMCSA[5] entitled *Defensive Driving Tips for CMV Drivers: An Internet-Based Approach*;

(4) A manual entitled *Commercial Driver's Manual*; and

(5) A manual published by the Smith Systems Driver Improvement Institute, Inc. entitled *Smith System is No Accident*.

[Doc. 39-1]. Based upon his review of the case, Mr. Napier reached three conclusions:

(1) Mr. Thompson failed in his duty to demonstrate the required minimal skills necessary while operating the involved commercial motor vehicle (the "CMV"), as required by FMCSR §§ 383.111 and 390.3(b),[6] including, but not

---

[5] The "FMCSA" is not identified by its full name in Mr. Napier's report.

[6] "FMCSR" refers to the federal motor carrier safety regulations promulgated by the U.S. Department of Transportation. Section 383.111, entitled "Required knowledge and skills," explains that all commercial motor vehicle operators should have knowledge of basic motor vehicle operations, like shifting, backing, and "space management." Section 390.3(b), a section of general applicability, provides that these regulations apply to all persons who operate a commercial motor vehicle in interstate commerce, and to all employers of such persons.

> limited to, the regulatory and industry standards related to space management, as well as the associated, recognized, and well-established standards for defensive driving;
>
> (2) Daily Express failed to establish and systematically implement standards for training Mr. Thompson to operate oversized CMVs subject to Daily Express's control; and
>
> (3) Daily Express and Mr. Thompson failed in their duties, as established by the FMCSR and the adopted industry standards of care, to prevent the wreck at issue.

[*Id.*].

Defendants object to these findings. They contend that Mr. Napier's expert report misidentifies the standard of care applicable to this case. For the appropriate standard, defendants instead point to Tenn. Code Ann. § 55-8-115(b), which provides that:

> Upon all roadways any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway . . . .

Defendants also point to Tenn. Code Ann. § 55-8-123(1), which provides that:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety . . . .

Defendants thus argue that Tennessee law, and not the amalgam of federal regulations and industry guidelines plaintiff offers, provides the appropriate standard of care in this case.

The Court agrees with defendants, and finds that the Tennessee Code provides the applicable standard of care in this case. The central conclusion Mr. Napier reaches in his report is that "a professional CMV driver, hauling a 'wide load' in [Mr. Thompson's

situation] would have moved further to the left [than he did], centering the CMV in such a manner as to effectively discourage any passing attempt by oncoming vehicles . . . ." [Doc. 39-1]. But he bases this conclusion on the guidelines in the manuals the Court has identified, rather than on either state or federal regulations. To the extent Mr. Napier does point to federal regulations, these regulations provide only general, common-sense guidelines as to how to operate motor vehicles, none of which appear to have been violated by Mr. Thompson's conduct in this case.

Moreover, to the extent the federal regulations in this case impose requirements upon drivers of CMVs in Tennessee, there is nothing to stop the Tennessee legislature from imposing even stricter requirements on those same drivers. *See Atherton v. FDIC*, 519 U.S. 213, 227 (1997) (holding that a federal statute's gross negligence standard "does not stand in the way of a stricter standard that the laws of some States provide."); *see also* 49 C.F.R. § 390.9 (providing that the FMCSR are "not intended to preclude States . . . from establishing or enforcing State or local laws relating to safety, the compliance with which would not prevent full compliance with these regulations"). Thus, where federal regulations provide general guidelines for safe driving, Tennessee is free to require more specific guidelines if Tennessee deems it necessary to do so. *See Montez v. United States*, 359 F.3d 392, 396 (6th Cir. 2004) (duties "of a general nature" imposed by federal statute do not "specifically prescribe a course of action" that persons must follow). That is the case here, where Tennessee has promulgated statutes directing drivers to align their vehicles, as Mr. Thompson did, "as close[ly] as practicable" with the right-hand edge of the roadway. *See*

Tenn. Code Ann. § 55-8-123(1). The Court thus holds that the relevant standard of care in this case is provided by Tennessee law, rather than by the general federal regulations and the various manuals to which plaintiff points. *See Kellner v. Budget Car & Truck Rental, Inc.*, 359 F.3d 399, 404 (6th Cir. 2004) (noting that Tennessee had codified the standard of care for specific driving situations by "making certain conduct illegal" and by "requiring drivers of commercial vehicles to take certain safety precautions" in some instances).

The Court now considers whether defendants' conduct violates that standard of care.

### B. Whether Defendants' Conduct Violates the Applicable Standard of Care

Having determined that Tennessee law provides the applicable standard of care in this case, the Court now considers whether defendants' conduct violates that standard of care. As noted, Tenn. Code Ann. § 55-8-115(b) provides that:

> Upon all roadways any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway . . . .

Tenn. Code Ann. § 55-8-123(1) provides further that:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety . . . .

The evidence in this case demonstrates that Mr. Thompson was driving his tractor-trailer as close to the right-hand edge of the roadway as was practicable when the accident at issue occurred. Indeed, the allegations in plaintiff's amended complaint that Mr. Thompson acted negligently in operating his tractor-trailer are premised upon his driving the tractor-trailer in

11

this manner. The Court thus finds that Mr. Thompson adhered to the appropriate standard of care in this case, and was therefore not negligent as a matter of law.[7]

The Court further notes two persuasive arguments defendants advance in support of this conclusion. First, as Trooper Larry Blakney–who arrived at the scene of the accident shortly after it occurred–averred, the only time a tractor-trailer operator is required to drive down the center of a roadway in Tennessee is when the permit issued by the Tennessee Department of Transportation expressly states that the driver must do so [*see* Doc. 40-5, ¶¶ 5, 12]. The issuance of permits like these is limited to situations in which a tractor-trailer exceeds a certain weight and will be passing over bridges or overpasses, which was not the case here [*see id.*, ¶ 12]. Second, it appears to the Court that if Mr. Thompson had been operating the vehicle as plaintiff alleges he should have been operating the vehicle–in the center of the roadway to discourage other motorists from passing him–Mr. Thompson would have been violating the straightforward provisions of Tenn. Code Ann. §§ 55-8-115(b) and 123(1). Indeed, as Trooper Blakney has averred, "if [Mr. Thompson] had been traveling down the center of the roadway at the time of the accident, [he] likely would have been cited for impeding traffic" [Doc. 40, ¶ 14].

---

[7] Plaintiff also contends that Mr. Thompson "failed to keep a diligent look-out for other traffic around him as he proceeded through the narrow road construction zone," *see* Doc. 28-1, ¶ 5, notwithstanding that plaintiff concedes that Mr. Thompson, "before shifting the tractor-trailer to the left . . . checked his rearview mirror to make sure the left-hand lane was clear of traffic," *see* Doc. 25, ¶ 16. It is not clear to the Court how, even had Mr. Thompson seen Ms. Parks attempting to pass him, Mr. Thompson could have acted any differently–or more safely–than he did in this situation. The Court thus agrees with defendants that "it would not have made the accident any less likely if Mr. Thompson had seen Ms. Parks in his mirrors as she was attempting to pass the tractor-trailer" [*see* Doc. 40].

The Court finally notes Daily Express's exemption from liability based upon the Court's conclusions above. Mr. Napier concludes that Daily Express "failed to establish and systematically implement standards for training [Mr.] Thompson to operate 'oversized' CMVs subject to [Daily Express's] control" [Doc. 39-1]. Had Daily Express trained Mr. Thompson as plaintiff argues Daily Express should have, however–by instructing him to position his tractor-trailer in the middle of the roadway when passing through a construction zone–Mr. Thompson would have been in violation of Tenn. Code Ann. §§ 55-8-115(b) and 123(1) as discussed above. The Court simply notes that the decision not to train drivers to operate their tractor-trailers in a manner that violates the law cannot be considered negligence.

### C. Consideration of the Evidence

For the reasons just given, the Court finds that summary judgment is appropriate in this case. Although the Court notes that the parties largely agree on the relevant facts in this case, the Court finds that a review of all of the evidence reinforces the Court's decision to grant summary judgment for defendants. This review also demonstrates that summary judgment for defendants would be appropriate even were plaintiff to have proceeded under his initial theory of the case.

There were three eyewitnesses to the accident in this case: Mr. Thompson, Mr. Jeffery Gethers, and Mrs. Lorna Gethers. In his deposition, Mr. Thompson testified as follows:

> Q: When you first saw Miss Parks's vehicle, was it on the pavement or was it on the grass median?

A: One wheel was on the pavement, one lane–wheel was on the grass median.

Q: And her car at that point was completely in front of you?

A: Yes, sir.

. . .

Q: Tell me–tell me what happened from the point you first saw her vehicle until her vehicle came to a rest . . . .

A: I seen the back end of her car wiggle like that. (Indicating.) Wiggle from side to side, right to left. Then all of a sudden I just seen it take off and go right straight across dead in front of me. I seen the car go up on top of the barriers like that. (Indicating.) She rolled over on her top going–spinning round and round till she got towards the median to where she got some traction underneath of her, and then I seen the car roll about three to four times . . . .

Q: Okay.

A: And I came to a stop after hitting the binder–or the brakes to stop the truck and then proceeded off to the right-hand side of the road in behind the construction barrels.

[Doc. 20-1, pp. 10-11]. Mr. and Mrs. Gethers were driving in a vehicle directly behind Mr. Thompson's tractor-trailer at the time of the accident [Doc. 25, ¶ 22]. In his deposition, Mr. Gethers testified as follows:

A: She proceeded in the left lane and she kind of weaved in–in and out, in and out . . . .

Q: Okay.

A: And that went on for a few miles. Well, a few minutes or–it seemed–it seemed like a lifetime, but–and–

. . .

Q: At any time did Mr. Thompson veer to the left?

14

> A: No, sir.
>
> Q: Did you observe Mr. Thompson do anything that would have caused Miss Parks to take any type of evasive action?
>
> A: No, sir.
>
> Q: Did you see Mr. Thompson do anything that would have caused Miss Parks to have lost control of her vehicle?
>
> A: No, sir.
>
> . . .
>
> Q: Did you observe Mr. Thompson do anything to cause this accident?
>
> [Object.]
>
> A: No, sir.
>
> . . .
>
> Q: Based upon what you observed that day, did Mr. Thompson do everything as safely as he possibly could? Again, based upon what you observed.
>
> A: Yes, sir.

[Doc. 21]. Similarly, in her deposition, Mrs. Gethers testified as follows:

> Q: Now, when you first observed my client, Mr. Thompson, the driver of the tractor-trailer, he was in what lane?
>
> A: The right lane.
>
> Q: From the time you first observed him until the time that the plaintiff in this case struck the barrier in front of him, did he appear to just continue in a straight path?
>
> A: Yes.

15

> Q: In the plaintiff's complaint, they allege that he veered suddenly to the left. Did you observe anything like that?
>
> A: No.
>
> Q: Did he veer in any way to the left?
>
> A: No.
>
> . . .
>
> Q: Did you observe Mr. Thompson, the driver of the tractor-trailer, do anything wrong, in your opinion?
>
> A: No.
>
> Q: Did he do anything–did you observe him do anything that caused this accident to occur?
>
> A: No.

[*Id.*].

Tennessee State Trooper Gary Snow arrived at the scene of the accident after it occurred [Doc. 20-11, ¶ 4]. Trooper Snow avers that, "[b]ased on [his] investigation, [he] concluded that the accident was caused by Ms. Laurel Parks's failure to keep her vehicle in the proper lane of traffic as it traveled through the construction zone" [*Id.*, ¶ 5]. He concluded in the alternative "that the accident was caused when Ms. Laurel Parks allowed her vehicle to run off the road" [*Id.*]. He based these conclusions on his determination that there was no physical contact between Ms. Parks's vehicle and the tractor-trailer driven by Mr. Thompson, and on witness statements that Mr. Thompson did not "veer or swerve" into the left lane as Ms. Parks attempted to pass the tractor-trailer [*Id.*, ¶¶ 6-7].

All of the available evidence, in short, indicates that Ms. Parks was at fault for the accident, and that Mr. Thompson did nothing to cause the accident. Plaintiff, of course, can rebut this evidence on summary judgment by "point[ing] to evidence in the record upon which a reasonable finder of fact could find in [his] favor." *Anderson*, 477 U.S. at 248. While plaintiff does attempt to undercut the evidence offered by defendants in some respects,[8] plaintiff has failed to point to any evidence in the record to support his allegations, let alone any evidence upon which a reasonable finder of fact could find in his favor. The Court thus finds that, regardless of whether the Court considers the theory plaintiff advances in his original complaint, or the theory plaintiff advances in his amended complaint, summary judgment is appropriate in this case.

## IV. Conclusion

The Court is mindful of the tragic nature of this case. Nevertheless, for the reasons above, plaintiff's Motion to Amend Complaint [Doc. 28] will be granted. Defendants' Motion for Summary Judgment [Doc. 20] will also be granted. This case will be dismissed.

An order accompanying this memorandum opinion will be entered.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[8] Plaintiff argues, for example, that because the vehicle Mr. Gethers was driving was located directly behind Mr. Thompson's tractor-trailer, and because there was "no traffic between Mr. Gethers['s] vehicle and Mr. Thompson's tractor-trailer save for Ms. Parks's vehicle," "neither Mr. [n]or Mrs. Gethers could have observed Ms. Parks 'weaving in and out of traffic'" [Doc. 25, ¶ 19].